Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



★ ★ ★ ★ ★ ★

# OPINION

No. 04-09-00530-CR

Pedro A. **ESCAMILLA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2008-CRS-777-D4
Honorable Oscar J Hale, Jr., Judge Presiding

Opinion by:  Sandee Bryan Marion, Justice
Dissenting and Concurring Opinion by:  Steven C. Hilbig, Justice

Sitting:  Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  October 13, 2010

AFFIRMED

A jury found appellant, Pedro A. Escamilla, guilty on one count of aggravated sexual assault of his two-year-old daughter ("D.A.E.") and assessed punishment at life in prison. We affirm.

## COMPETENCY OF CHILD WITNESS

In his second issue, appellant asserts the trial court erred by admitting into evidence D.A.E.'s testimony because she was not competent to testify due to her age and her insufficient

intellect. In his first issue, appellant asserts the trial court erred by admitting into evidence the outcry testimony given by D.A.E.'s mother because D.A.E. was not competent to testify and, therefore, not "available" to testify.

At trial, D.A.E. testified her father, the appellant, touched her with his finger. D.A.E. indicated where he touched her by pointing to the vaginal and anal area of a doll. Appellant asserts D.A.E. was not competent to give this testimony for the following reasons: (1) D.A.E.'s mother admitted that on one occasion someone at the Children's Advocacy Center was unable to interview D.A.E. because she was not verbal enough; (2) D.A.E.'s testimony was inconsistent; (3) D.A.E. did not understand the difference between the truth and a lie; and (4) D.A.E. lacked the ability to observe, recollect, and reliably narrate events. Appellant also contends that D.A.E.'s age, coupled with her mental illness, preponderates against a finding that she was competent to testify. We review a trial court's determination that a child witness is competent to testify for an abuse of discretion. *Kirchner v. State*, 739 S.W.2d 85, 88 (Tex. App.—San Antonio 1987, no pet.). On appeal, we must review the entire testimony of the child witness to determine if the trial court abused its discretion. *Id.*

There is no age below which a child is automatically deemed incompetent to testify. *De Los Santos v. State*, 219 S.W.3d 71, 80 (Tex. App.—San Antonio 2006, no pet.) "Children . . . who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated" "shall be incompetent to testify in any proceeding subject to these rules . . . ." TEX. R. EVID. 601(a)(2). In making a determination of competency to testify a trial court considers (1) the competence of the child to observe intelligently the events in question at the time of the occurrence, (2) the child's capacity to recollect the events, and (3) the child's capacity to narrate the facts. *Watson v. State*, 596 S.W.2d

867, 870 (Tex. Crim. App. 1980); *Hollinger v. State*, 911 S.W.2d 35, 38–39 (Tex. App.—Tyler 1995, pet. ref'd). The third element requires the witness to be able to understand the questions that are asked, to be able to frame intelligent answers to those questions, and to be able to understand the moral responsibility to tell the truth. *Watson*, 596 S.W.2d at 870; *De Los Santos*, 219 S.W.3d at 80. Confusing and inconsistent responses from a child are not reasons to determine she is incompetent to testify; rather, they speak to the credibility of her testimony. *In re A.W.*, 147 S.W.3d 632, 635 (Tex. App.—San Antonio 2004, no pet.). The trial court's role is to make the initial determination of competency, not to assess the credibility or weight to be given the testimony. *Id.*

At the time of trial, one year after her outcry, D.A.E. was three years and nine months old. At the competency hearing, she knew her age and the first and last names of her parents and she could identify colors. When the prosecutor pointed to a blue object and said "If I say this color is black . . . .," D.A.E. interrupted and said the object was blue. When the prosecutor asked if she [the prosecutor] was wrong about the color, D.A.E. responded "yes." When asked what happens to her when she misbehaves, D.A.E. agreed that her mother "gets after" her. At trial, D.A.E. identified her dog as a Chihuahua. She also knew the first names of her two brothers. She identified the location of a vagina and the anal area by pointing to her doll. She testified without hesitation that her father touched her with his hand while her mother was at the flea market. When shown a picture of a house, she identified the house as "where we used to live with my father." D.A.E. answered "yes," when asked if she was afraid of her father. She knew she was going to school in September and she would get a backpack. When asked on cross-examination if she remembered telling someone that her father "poked [her] vagina with a

stick," she answered "yes." However, she explained "he actually poked me with his hand. With his finger."

The sexual assault nurse examiner who conducted the physical examination of D.A.E. characterized D.A.E. as "shy" and as having "poor eye contact." Dr. Gregorio Pina III, a licensed psychologist with the Child's Advocacy Center in Laredo, Texas, testified he first saw D.A.E. when she was two years and ten months old. At the time, D.A.E. was beginning to take medication for attention deficit hyperactivity disorder and there is a history of mental illness in the family. Dr. Pina described D.A.E. as a "serious child," "open," "[a]ppears angry when stressed at different points of the interview," "explored the room easily," "expressive," "talks a lot," "can be demanding," "appeared self-assured," and had "good hygiene and made good eye contact." He said he and D.A.E. communicated well and she corrected him if he did not get something right. According to Dr. Pina, D.A.E.'s words and moods were consistent with each other and she had a good range of emotions. D.A.E. has no delusions in that she did not see, hear, smell, or touch non-existent things, and he did not think she had any problems with her memory functions. Dr. Pina stated, "In fact, for her age, she had a very, very good memory in all the areas that I took a look at." As to his estimation of her intelligence, Dr. Pina determined D.A.E.'s was "appropriate for a child from her culture, and her intellectual levels would be average." He considered her coherent and logical. Dr. Pina found D.A.E.'s symptoms consistent with other children who have been sexually abused, and that her story was consistent within the same interview and across different interviews with different interviewers.

We give great deference to the trial judge who was there to personally evaluate the child and her responses; accordingly, after reviewing the record, we are not persuaded the trial court abused its discretion in permitting D.A.E. to testify.

As to appellant's complaint regarding allowing D.A.E.'s mother to testify about D.A.E.'s outcry, D.A.E.'s mother testified she called home from the flea market and D.A.E. said "her butt hurt." The mother then spoke to appellant who said D.A.E. had soiled her diaper and he would bring D.A.E. to her for a diaper change. D.A.E.'s mother said this was the first time appellant brought D.A.E. to her for a diaper change and appellant himself usually changed the diapers. As the mother was changing D.A.E.'s diaper, D.A.E. told her mother "not to rub her real hard, because it would hurt her." Once at home, when the mother bathed D.A.E., D.A.E. again said her bottom hurt. The next day, when the mother finally asked D.A.E. why she hurt, D.A.E. told her mother that appellant "put cream on her" and "poked her in the anus." D.A.E. showed her mother a small jar of oil that he used. The mother saw a redness around D.A.E.'s vagina and anus that was not the same as diaper rash. That same afternoon, she took D.A.E. to the hospital where she was examined by the sexual assault nurse examiner.

Outcry testimony admitted in compliance with Texas Code of Criminal Procedure article 38.072 is admitted as an exception to the hearsay rule, meaning it is considered substantive evidence, admissible for the truth of the matter asserted in the testimony. *Martinez v. State*, 178 S.W.3d 806, 811 (Tex. Crim. App. 2005); *Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991). Article 38.072 provides such outcry testimony is not inadmissible because of the hearsay rule if, among other conditions, "the child . . . with a disability testifies or is available to testify at the proceeding in court or in any other manner provided by law." TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(3) (Vernon 2005). Appellant argues that because D.A.E. was not competent to testify—and therefore was not "available" to testify—D.A.E.'s mother's testimony was inadmissible. Because we conclude D.A.E. was competent to testify, we conclude the trial court did not err in allowing D.A.E.'s mother to testify about D.A.E.'s outcry to her.

**TESTIMONY OF NURSE**

America Garza, a sexual assault nurse examiner ("SANE"), testified that her examination of D.A.E. revealed two symptoms consistent with sexual abuse: a tear close to D.A.E.'s anus and the wide dilation of D.A.E.'s anus within seven seconds after retraction of the child's buttocks. In his third issue, appellant asserts the trial court erred in allowing Garza to testify regarding the dilation of D.A.E.'s anus because her opinion was not based on a valid scientific theory, the technique applying the theory was not valid, and the technique was not correctly applied.

"The Texas Rules of Evidence set out three separate conditions regarding admissibility of expert testimony." *Vela v. State*, 209 S.W.3d 128, 130 (Tex. Crim. App. 2006). Rule 104 requires that "[p]reliminary questions concerning the qualification of a person to be a witness . . . be determined by the court . . . ." TEX. R. EVID. 104(a). Under Rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." *Id.* at 702. Finally, Rules 401 and 402 render testimony admissible only if it "tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 401, 402. "These rules require a trial judge to make three separate inquiries, all of which must be satisfied before admitting expert testimony: "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Vela*, 209

S.W.3d at 131. Although appellant objected to both Garza's qualifications and the reliability of her testimony below, on appeal he challenges only the reliability of her opinion regarding dilation of D.A.E.'s anus.

Rule of Evidence 705(c) governs the reliability of expert testimony and states that "[i]f the court determines that the underlying facts or data do not provide a sufficient basis for the expert's opinion under Rule 702 or 703, the opinion is inadmissible." TEX. R. EVID. 104(a); *Vela*, 209 S.W.3d at 133. "Reliability depends upon whether the evidence has its basis in sound scientific methodology, and this demands a certain technical showing." *Vela*, 209 S.W.3d at 133. "And that showing gives a trial judge the opportunity to 'weed out testimony pertaining to so-called 'junk science.'" *Id.* (internal citation omitted). "Thus, just because 'junk science' or otherwise inadequately tested scientific theories might be shown to relate to the facts of a case, it will not always have a sufficiently reliable basis." *Id.*

Scientific evidence must meet three criteria to be considered sufficiently reliable as to be of help to a jury: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *Vela*, 209 S.W.3d at 134. Factors that could affect a trial court's determination of reliability include, but are not limited to, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the

court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Id.*

"Even if the traditional *Kelly* reliability factors do not perfectly apply to particular testimony, the proponent is not excused from proving its reliability." *Vela*, 209 S.W.3d at 134. "In some cases, the reliability of scientific knowledge will be at issue; in others, 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *Id.* (internal citation omitted). "But the proponent must establish some foundation for the reliability of an expert's opinion." *Id.* "Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case." *Id.*

Garza stated that in 2009, the year of the underlying trial, she had conducted close to 100 sexual assault examinations. Following her examination of D.A.E., Garza said she found a tear close to D.A.E.'s anus that was consistent with sexual abuse, either by manipulation or forcible penetration. She also stated that the wide dilation of D.A.E.'s anus within seven seconds after retraction of the child's buttocks was consistent with sexual abuse. According to Garza, it takes at least one minute for a normal anus to start to dilate, but it took only seven seconds for D.A.E.'s anus to dilate.

When asked to explain the reasoning or methodology she used in reaching her opinion about dilation, Garza could not be any more specific than to state "based on my training," "my readings and stuff," the conferences she attends, and "research and the peer reviews." Garza explained that by "peer review" she meant "where . . . SANE nurses . . . are able to share information, learn from each other. We're able to review cases . . . see slides, pictures." When asked if she knew the known or potential rate of error for the application of the theory on anus dilation, Garza could only state "we base ourselves on what the patient tells us, the history and

our findings." Although Garza said she based her opinion on literature by Dr. Nancy Kellogg, Garza could not name a specific article written by or a study conducted by Dr. Kellogg. Garza also said she based her opinion on literature by Dr. John McCann, but she could only reference a magazine article possibly written in 2008. When asked whether the technique or methodology she used in formulating her opinion was generally accepted in the medical community, Garza responded, "It is accepted." However, when asked why her technique or methodology was generally accepted in the medical community, she stated, "Our trainings through the Office of the Attorney General."

We conclude the State established Garza's qualifications and Garza was able to explain her methodology with sufficient clarity. However, Garza could not elaborate on the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; she could make only vague references to literature supporting her underlying scientific theory and technique; and she did not appear to understand the concept of "the potential rate of error of the technique." Therefore, we must conclude the State did not carry its burden to "establish some foundation for the reliability of [Garza's] opinion." *Vela*, 209 S.W.3d at 134. Thus, the trial court erred by allowing into evidence her opinion that the quick dilation of D.A.E.'s anus was consistent with sexual abuse. However, that does not end our inquiry. We next must determine whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In light of D.A.E.'s own testimony, her mother's testimony about D.A.E.'s outcry, Dr. Pina's testimony, and Garza's testimony about the tear close to D.A.E.'s anus, the jury could have convicted appellant without the objectionable portion of Garza's testimony. Accordingly,

we conclude the error did not have a substantial and injurious effect or influence in determining the jury's verdict.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's judgment.


Sandee Bryan Marion, Justice

Publish